# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

R. L., by and through her parents and :
next friends, MR. AND MRS. L., :
      Plaintiffs, :
           :
v. :   Civil Action No. 3:02 CV 16 (CFD)
           :
PLAINVILLE BOARD OF EDUCATION, :
      Defendant. :

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiff R.L. ("R.") is a twelve-year-old girl attending the Plainville public schools.[1]

R.L.'s parents ("Mr. and Mrs. L." or "the Ls"), acting as her next friends, brought this suit

against the Plainville Board of Education ("Plainville" or "Board"), seeking injunctive and

declaratory relief pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400

et seq. ("IDEA").[2]  Specifically, the Ls appeal the decision of a due process administrative

hearing officer, who ruled that the educational program offered to R. during the 2001-2002

school year satisfied the IDEA's requirements that she receive a "free appropriate public

education" in the "least restrictive environment" possible.

The plaintiff claims seven grounds for reversal of the administrative hearing officer's

decision, all of which allegedly violated the IDEA and Mr. and Mrs. L's due process rights under

---

[1] Due to the amount of confidential medical information about plaintiff which forms part of this suit, plaintiff and her parents will be referred to by their initials throughout this ruling.

[2] The IDEA recently has been amended by the Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, 118 Stat. 2647 (Dec. 3, 2004), which takes effect on July 1, 2005.  Since all of the relevant events occurred well before the passage of those statutory amendments, the citations herein refer to the pre-2004 IDEA.

that statute: 1) the hearing officer evaluated a modified version of R's Individualized Education Program ("IEP"), not the version of the IEP that originally had been proposed to Mr. and Mrs. L.; 2) the hearing officer inappropriately applied the procedural requirements of the IDEA when she found that R. was being mainstreamed to the maximum extent appropriate; 3) the hearing officer, in determining that R. was sufficiently mainstreamed, failed to consider expert testimony offered by Mr. and Mrs. L. about how supplementary aids and services could increase R.L.'s mainstreamed time; 4) the hearing officer did not apply the correct legal standard in finding that the Board was not obliged to pay for an independent educational evaluation obtained by Mr. and Mrs. L.; 5) the hearing officer erroneously applied state and federal law in determining that the Board was not obliged to initiate a due process hearing after declining to pay for Mr. and Mrs. L's independent educational evaluation; 6) the hearing officer improperly found that R.'s early dismissal from school on Friday afternoons did not violate her rights under the IDEA; and 7) the hearing officer inappropriately determined that the Board was not required to employ an independent outside expert to oversee and coordinate the provision of special education services to R.  Mr. and Mrs. L. seek equitable relief in the form of a reversal of the hearing officer's decision, as well as attorney's fees.

The defendant argues that the administrative record belies the plaintiff's allegations and that the hearing officer correctly decided that R. was receiving a free appropriate public education.  The parties have filed cross-motions for summary judgment.

I.    **Background**[3]

---

[3] The following facts are taken from the parties' summary judgment papers, Local Rule 56(a) (formerly Local Rule 9(c)) statements), and other evidence submitted by the parties.  They are undisputed unless otherwise noted.

R. was born on October 15, 1992 with Sanfillipo syndrome, also known as mucopolysaccaridosis III ("MPS III").  Mucopolysaccharides are long chains of sugar molecules that the body uses to build connective tissue.  Normally, one's body continuously breaks down the used mucopolysaccharides for disposal.  An individual with MPS III, however, lacks one of the necessary enzymes to break down these chains.  As a result, the incompletely broken-down chains remain stored in the body's cells, where they cause progressive damage.  That damage manifests itself in delayed development, hyperactivity, sleep disorders, hearing impairment, retinal degeneration, and either speech failure or degenerative loss of speech.  As MPS III sufferers grow older, more and more cells are affected, and their symptoms worsen.  The average lifespan of an individual with MPS III is about fifteen years.

Since her third birthday, R. has received special education services from the Plainville Board of Education.[4]  Although at one point R. had a vocabulary of thirty to fifty words, she has since lost the ability to communicate verbally.  In the time that Plainville has provided her services, R. has also shown some hearing loss (which has since stabilized and to compensate for which she uses hearing aids), stiffening of her joints, curling of her hands and feet, sleep disorders, and hyperactivity.  The Connecticut Children's Medical Center conducted a multidisciplinary Program for Evaluation of Development and Learning ("PEDAL evaluation") on R. in the fall of 2000 (around the time of her eighth birthday); that evaluation concluded that R.'s overall mental functioning was at the level of a ten-month-old child.  In regard to daily living skills such as dressing and grooming, she functioned at approximately a seventeen-month-

_____

[4] At the time of the events that are the subject of this litigation, R. was enrolled at Toffolon Elementary School in Plainville.

old level. At the time of the evaluation, R. displayed limited fine motor skills and compromised gross motor skills: although she could walk independently on a flat surface, she could not get up and down from the floor or maneuver curbs without assistance, and she required supervision when climbing stairs.

Once R. entered the Plainville public schools, her yearly educational program was coordinated by a Planning and Placement Team (PPT).[5] The current dispute between the parties stems from a June 15, 2001 PPT meeting convened to write R.'s IEP for the school year beginning in September 2001 (when she was slated to enter the third grade). At the time of the June 2001 meeting, the PPT included as members Mr. & Mrs. L; Maureen Schiffer, Plainville's Director of Special Education; Susan Steele, the teacher for the regular third grade class to which R. was assigned; Gloria Marshall and Ann Sullivan, R.'s special education teachers; Danielle King, R.'s supplementary speech and language pathologist; Susan Freeman, R.'s physical therapist; Lauri Susi, a specialist in the area of assistive technology retained by Plainville; Regina Albee, R.'s paraprofessional aide, who also served as Toffolon's "case manager" coordinating the various components of R.'s educational program; Jeri Turkowitz, the Toffolon Elementary school psychologist; Lynda Faro, a representative of the Connecticut Department of Mental Retardation; and Karen Olson, a representative of the Connecticut Board of Education and Services for the Blind.

---

[5] The IDEA requires that "public schools create for each student with a disability a written individualized educational program ("IEP") of study best suited to the child's special needs. An IEP is typically prepared by an IEP Team, consisting of parents, teachers, and educational specialists who meet and confer in a relatively informal, collaborative process to determine how best to accommodate the needs of the disabled student. In Connecticut, the IEP Team is known as a Planning and Placement Team ("PPT")." J.C. v. Regional Sch. Dist. 10, 278 F.3d 119, 121 (2d Cir. 2002) (internal citations omitted).

After discussion among the PPT members at the June meeting, Maureen Schiffer sent Mrs. L. a draft IEP for the 2001-2002 school year on June 21, 2001.  See Administrative Record at Exh. B-1.  The IEP included an evaluation of R.'s present levels of educational performance in seven categories (academic/cognitive; social/behavioral; communication; motor skills; vocational; self-help; and health and development) and then proceeded to list goals for R.'s progress during the upcoming academic year of improvement in all those categories via a list of short-term objectives.  These objectives included items such as R. learning to "take books, papers, projects, etc. out of [her] backpack, then put [them] in appropriate places with minimal assistance . . . ," "get up off the floor with minimal assistance . . . ," "actively participate (e.g., activate switch) during a curriculum-based computer activity . . . ," "attend to a peer-read book for up to 10-15 minutes," and "scoop food that is thick, soft, (e.g., pudding, yogurt) with hand over hand assistance and adaptive equipment as needed . . . ."[6]  Plainville hoped that, by the end of 2001-2002 school year, R. would be able to perform these short-term objectives around 80% of the time.

To assist R.'s realization of the IEP's stated goals, Plainville noted that R. would require special education services, adaptive physical education, speech and language therapy, physical therapy, and an assistive technology plan.  The draft IEP stated that R. would spend 8.75 hours per week in special education, 3.25 hours per week in related therapies, and 16 hours per week mainstreamed into a regular education environment, for a total of 28 instructional hours per week.  R. would attend a regular-length school day every day except Friday, when she would be

---

[6] This is not a complete list of the short-term objectives included in the draft IEP, but is intended to represent the general nature and scope of the goals set for R. in that document.

dismissed early at 1:00 p.m.  See Administrative Record, Exh. B-1 at 21.

The draft IEP also contains a space entitled "Discussion Summary," in which the PPT members can list areas of disagreement and parent responses.  The discussion summary in R.'s IEP contained a list of written requests made by Mrs. L., with Plainville's responses interspersed:

> (1) 3 hour a week consultant—district agrees with 1 hr. [per] month with Dr. Morgan . . . (2) Mrs. [L.] requests that [R.] not be dismissed early on Fridays to allow for more mainstreaming— district to work with mother . . . to discuss this issue; (3) Mrs. [L.] requests [R.] be in the mainstream 80% of the day, however, during the meeting she stated that the time in the mainstream needs to be meaningful—the district will increase mainstream time as appropriate (initial schedule to be provided 8/01); (4) District agrees to provide case manager for 2 hours per day . . . ; (5) Mrs. [L.] requests para[professional aide assigned to R.] be consistent throughout the day—the district agrees to attempt to provide consistency; (6) Mrs. [L.] requested [occupational therapy] and sensory diet—district agreed to OT screening (based on previous information, [R.] does not need OT) . . . ; (7) Mrs. [L.] requests that PECS [Picture Exchange Communication System language development training] be used exclusively for communication. . . .  District agrees with this . . . . ; (8) Mrs. [L.] requests 3 audiological evaluations per year, annual auditory perception eval[uation], and 2 inservice trainings per year. (District did not agree to this but will develop plan); (9) Mrs. [L.] requests that bike, hearing aids, and stroller be maintained by the district—district will order bike for [R.]'s use, will no longer use the stroller and will include hearing aid issues in the audiological plan.  The district denies to pay for the independent evaluation by Dr. Itzkowitz rec'd 5/29/01 . . . .

Id. at 9.

On July 12, 2001, Mrs. L. wrote back to Maureen Schiffer, noting her dismay with the draft IEP (primarily for the reasons stated in the IEP's discussion summary) and expressing her opinion that the IEP did not fully and fairly represent the discussion at the June 15 PPT meeting.  See Administrative Record at Exh. B-58.  Schiffer and Mrs. L. continued to communicate by letter throughout the summer.  In that correspondence, Schiffer maintained that the draft IEP adequately treated all the Ls' concerns, though she clarified that R.'s final classroom schedule

would be provided "on or before the first day of school," and that R.'s audiological plan similarly would be delayed until the start of school since Plainville's consultants were unavailable during the summer. Schiffer wrote to Mrs. L. that if she "still [felt] that the program we have developed does not meet all of [R.]'s needs, then the district would be willing to reconvene the IEP team." Administrative Record at Exh. B-55.

The IDEA provides that parents dissatisfied with a proposed IEP may file a complaint with their state department of education, after which filing the parents are entitled to "an impartial due process hearing, which shall be conducted . . . [in accordance] with State law . . . ." 20 U.S.C. §§ 1415(b)(6), 1415(f)(1). Mr. and Mrs. L. requested a due process hearing on August 6, 2001. In accordance with state law, the Connecticut Department of Education then appointed an impartial hearing officer to conduct the hearing. See Conn. Gen. Stat. § 10-76h(c)(1). The parties submitted seven questions to be resolved by the hearing officer:

> 1. Does the program offered by the Board for the 2001-2002 school year provide the student with an appropriate program of special education and regular education in the least restrictive environment ("LRE")?
> 2. Is the Board required to employ an outside educational consultant to the student's program mutually agreed upon by the Parents for the student to receive a free appropriate public education ("FAPE")?
> 3. Does dismissal from school two hours early on Fridays deny the student FAPE?
> 4. Are the related services requested by the Parents including a sensory diet, and occupational therapy, necessary for the student to receive FAPE?
> 5. Are the related services/assistive technology requested by the Parents—bike, stroller and FM hearing aid system—required to be purchased for the student and maintained by the school in order for the student to receive FAPE?
> 6. Are the parents entitled to reimbursement for the costs associated with the independent educational evaluation completed by Judy Itzkowitz?
> 7. Is a collaborative team building exercise such as MAPS/COACH a necessary component to the student's program in order for the student to receive FAPE?

Administrative Record, Final Decision and Order, Case No. 01-265 ("Administrative Decision"),

at 1.

An eight-day due process hearing was conducted in R.'s case on August 28, September 5,

11, 14, 19, 20, 21, and 24, 2001. On December 10, 2001, the hearing officer issued an eleven-

page decision finding in favor of Plainville on all issues. See Administrative Decision at 11. Mr.

and Mrs. L. then appealed to this Court, in accordance with the procedures set forth at 20 U.S.C.

§ 1415(i).

## II.    The Individuals with Disabilities Education Act

The IDEA represents "an ambitious federal effort to promote the education of

handicapped children." Board of Educ. v. Rowley, 458 U.S. 176, 179 (1982). Because the

statute expresses that disabled children should be educated alongside non-disabled peers "to the

maximum extent appropriate," special education services must be provided in the least restrictive

environment consistent with the child's educational plan. Only when "'the nature or severity' of

a child's disability is such 'that education in regular classes with the use of supplementary aids

and services cannot be achieved satisfactorily' should a child be segregated." Walczak v. Florida

Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (quoting 20 U.S.C. § 1412(5)).

In order to ensure that the balance of services required to meet these goals is specifically

fitted to the particular child, the IDEA requires that each child receive an individualized

education program. The IEP is intended to be "the result of collaborations between parents,

educators, and representatives of the school district." Lillbask v. Connecticut Dep't. of Educ.,

2005 U.S. App. LEXIS 1655, *6 (2d Cir. Feb. 2, 2005). While the IEP does not have to

maximize the child's educational potential, it must provide "meaningful" opportunities and the

8

possibility for more than "trivial advancement." Walczak, 142 F.3d at 130.

## III. Standard of Review

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986 ) (quoting Fed. R. Civ. P. 56(c)). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. Celotex, 477 U.S. at 323.

A motion for summary judgment in a case brought under the IDEA, however, "often triggers more than an inquiry into possible disputed issues of fact. Rather, the motion serves as a 'pragmatic procedural mechanism' for reviewing a state's compliance with the procedures set forth in [the] IDEA. . . ." Lillbask, 2005 U.S. App. LEXIS at *12, n.3. Upon appeal to a federal court, the ruling of an administrative hearing officer is subject to "independent judicial review." Board of Educ. v. Rowley, 458 U.S. at 205. The reviewing court must give "due weight" to the administrative record, while at the same time conducting its own two-part inquiry: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the

9

child to receive educational benefits?"  Id. at 206-07.

Ultimately, the reviewing court must base its decision on the preponderance of the

evidence, "taking into account not only the record from the administrative proceedings, but also

any further evidence presented before the District Court by the parties."  Grim v. Rhinebeck

Cent. Sch. Dist., 346 F.3d 377, 380 (2d Cir. 2003).  The Supreme Court has stated, however, that

independent review "is by no means an invitation to the courts to substitute their own notions of

sound educational policy for those of the school authorities they review."  Rowley, 458 U.S. at

206.

## IV.    Discussion

The Court reviews each of Mr. & Mrs. L.'s challenges to the administrative hearing

officer's decision in turn.

### A.    Modifications to the June 2001 IEP

Mr. & Mrs. L. contend that the version of the IEP evaluated by the hearing officer in the

fall of 2001 had been modified from the draft IEP presented to them in June of the same year,

and that those modifications were made without reconvening R.'s Planning and Placement Team,

itself a per se violation of IDEA.  Moreover, they claim that the hearing officer wrongly focused

on the revised IEP, rather than limiting her review to the June 2001 IEP about which Mr. and

Mrs. L. initially complained.

According to Mr. and Mrs. L., the June 2001 IEP was modified in two general ways: the

weekly hours that R. spent in mainstream and regular education were altered slightly, and some

supportive services for R. were supplemented (i.e., Plainville increased the number of hours per

month it would involve its outside special education consultant in R.'s case, and firmed up its

10

commitment to create an audiological plan for R.).  The Court finds that neither of these categories of modifications created a new IEP that had to be ratified by the Planning and Placement Team, nor was it improper for the hearing officer to consider these modifications in determining the overall appropriateness of R.'s IEP for the 2001-2002 school year.

It is true that the June 2001 draft IEP contained inaccurate figures for the total weekly time that R. would spend in regular and special education.  While the draft IEP stated that R. would be in a regular education environment sixteen hours per week, her actual amount of mainstream time was 14 hours and fifty minutes per week.  Similarly, while her draft IEP stated that R. would be in special education for 8 hours and forty-five minutes per week, her actual special education time was 10 hours and thirty-five minutes per week.[7]  Finally, the June IEP indicated that R. would have early release on Friday afternoons at 1:00 p.m., but the school later changed R.'s release time to 1:25 p.m.

The Court, however, finds that it was foreseeable during the IEP process that these numbers might be adjusted, since the June 2001 IEP meeting took place before the relevant academic year had begun.  The June IEP reflects Mrs. L.'s wish that R. be mainstreamed to a greater degree, to which Plainville responded that it would "increase mainstream time as appropriate (initial schedule to be provided 8/01)."  Administrative Record, Exh. B-1 at 9.   In Plainville's letters to the Ls after the June 2001 IEP meeting, the Board reminded the Ls that they

---

[7] When the time that R. spent in "reverse mainstream" education (activities with non-disabled children conducted outside the mainstream classroom) and related services (physical therapy, adaptive physical education, and speech and language therapy) is added to those figures, R. spent a total of 30.5 hours per week in school, rather than the 28 hours per week listed in the draft IEP.

would receive R.'s initial schedule "on or before the first day of school." Id. at Exh. B-55.[8]

Susan Steele, R.'s mainstream classroom teacher for 2001-2002, testified at the administrative

hearing that she had not yet received her final classroom schedule (which the PPT needed to

definitively plan R.'s day) by the time of the June meeting: "[T]he team had come up with

everything that [R.] needed in her program that would be meaningful for her. But the actual

schedule was not set at that time . . . . I just told them that I would be flexible about working

with them trying to arrange my schedule."[9] Hearing Transcript, Sept. 21, 2001, at 11. R.'s

special education teacher Ann Sullivan agreed that "as third grade classrooms get into their first

three weeks of school, they make some minor changes in their schedule," necessitating

corresponding changes in R.'s schedule. Hearing Transcript, Sept. 19, 2001, at 179.

      Mr. and Mrs. L. do not allege that the edits to R.'s IEP affected the substantive services

provided her, but claim the very fact that changes were made constitutes an admission that the

June 2001 IEP was inappropriate. "Technical deviations," however, "will not render an IEP

invalid." S. v. Vashon Island Sch. Dist., 337 F.3d 1115, 1129 (9th Cir. 2003). As long as

"drafting deficiencies [are] matters of form rather than substance," an IEP may be revised to give

a more accurate account of services provided or to reflect "minor and technical changes."

Kathleen H. v. Mass. Dep't. of Educ., 154 F.3d 8, 13-14 (1st Cir. 1998). Nor was the hearing

---

[8] This same letter offered Mr. and Mrs. L. the opportunity to reconvene the PPT and hold another meeting on R.'s IEP. The Ls declined this offer.

[9] Mainstream classes in Plainville have a rotating series of enrichment classes, called "specials," and which include music, art, and library sessions. The "specials" take place on different times and days throughout the week, on a rotating schedule. It was largely due to Ms. Steele not having a final schedule for her classroom's "specials" that the PPT could not definitively determine at what times R. (who did not participate in all "specials") would be working apart from her mainstream classmates. See Hearing Transcript, Sept. 24, 2001, at 113.

officer required to examine the June 2001 IEP in isolation from those modifications. "[E]ven if the IEP was initially deficient, our focus in assessing its adequacy is on the IEP as it emerges from the administrative review process." Id. at 13; see also Walczak, 142 F.3d at 126 (noting that the administrative officer could postpone a due process hearing to allow the school district time to correct a technical defect in the challenged IEP).

Nor does the Court find that Plainville's voluntary expansion of services from those provided in the June IEP to constitute a violation of the IDEA. During the administrative process, Plainville provided more information on the audiological services it intended to supply to R., and indicated that it would purchase a set of hearing aids for R.'s use at school. Again, the provision of more detail on the audiological plan is consistent with both the June 2001 IEP, in which Plainville committed to developing an audiological plan for R., and Maureen Schiffer's July 2001 letter to Mrs. L. ("The [audiological] plan will be developed as soon as both consultants respond to my contacts."). Plainville also offered to increase the number of hours it would retain Dr. Felicia Morgan, an independent educational consultant, to provide services to R.'s program. This appears to have been "offered as 'something more than the minimum requirement' . . . in the spirit of compromise." Fuhrmann v. East Hanover Bd. of Educ., 993 F.3d 1031, 1036 (3d Cir. 1993). The Court holds that these modifications, instituted in response to parental concerns and in an attempt to improve R.'s educational program, do not violate the IDEA. See id.; see also S. v. Vashon, 337 F.3d at 1129 (stating that only "procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, or that caused a deprivation of educational benefits" violate the IDEA).

Therefore, the Court affirms the decision of the hearing officer and finds in favor of the defendant as to Mr. and Mrs. L's first claim.

**B.     The Determination that R. was Mainstreamed to the Maximum Extent Appropriate**

Mr. and Mrs. L. contest the hearing officer's decision on two grounds as it pertains to R.'s mainstream education time: they argue both that the hearing officer improperly determined that R. was being mainstreamed to the maximum extent possible under the IDEA, and that the hearing officer failed to consider sufficiently the expert testimony they offered as to how R.'s mainstream time could be increased.

The administrative hearing officer concluded that R.'s IEP met the legal standard of mainstreaming her to the maximum extent appropriate: "In this case, the student is non-verbal and is working on pre-academic skills.  She functions at approximately the level of a one-year-old. . . .  The student is mainstreamed more than half of her day and has reverse mainstreaming with non-disabled peers for 45 minutes daily at lunch and recess time.  Additional mainstreaming would negatively impact the student's skill acquisition in a special education setting."
Administrative Decision at 9.

The administrative record shows that R. suffers from a syndrome that causes global developmental delays.  Mrs. L. testified that R. could "probably not" demonstrate any age-appropriate skills, and that R.'s cognitive abilities were compromised because of her difficulties with attention span, distractibility, and consistency of responses to stimuli.  Hearing Transcript, Sept. 11, 2001, at 6, 92, 93.  The parties agree that R. is unable to participate in the academic content of a regular third-grade curriculum; rather, R.'s mainstream time is intended to provide

14

her with social models and age-appropriate peer interaction.  See Hearing Transcript, Sept. 14,

2001, at 158, 212 (testimony of Dr. Judith Itzkowitz).  The Plainville witnesses, however,

testified that the positive effects that R. received from mainstreaming had to be balanced with the

need to teach her skills that could not be provided in that setting:

> I agree with [the plaintiffs] in terms of including [R.]; I think that that's an
> important part of her program, but it's my philosophy that we need to balance
> inclusions with skill acquisition.  And my concern is that if we focus too much on
> inclusion without an appropriate amount of time spent in skill acquisition, that
> she'll be limited in her ability to meaningfully participate in group activities.  And
> to move ahead in terms of developing and acquiring skills.

Hearing Transcript, Sept. 19, 2001, at 26-27 (testimony of Dr. Felicia Morgan).

R.'s goals in her 2001-2002 IEP were grouped into three general categories:

communication, self care, and inclusion specifically for social and play skills.  Id.  Primary

among these was the need to teach R. a functional communication system.  See id. at 27-28; see

also Hearing Transcript, Sept. 11, 2001 at 12 (testimony of Mrs. L.).  Based upon the results of

R.'s PEDAL evaluation, the decision was made to focus on intensive training in the Picture

Exchange Communication System ("PECS").  See Administrative Record, Exh. B-16 at 6.

PECS is a progressive communication system which relies upon a set of cards with icons

illustrating important "grammar" or concepts (e.g., "break," "snack," "more").  PECS acquisition

is broken into six phases.  In Phase One, all that is taught is the basic exchange of the picture

card.  Phase Two involves distancing, where the child must go get the card from some distance

and then exchange it with the teaching partner.  Phase Three is discrimination training, teaching

the child to discriminate between cards.  Phases Four through Six deal with more advanced

sentence structure, where the child places the picture card within a sentence strip to form

complete phrases, uses sentence strips to respond to questions, and finally, uses the picture cards to make general comments not in response to questions. See Hearing Transcript, Sept. 14, 2001, at 56-59 (testimony of Dr. Robert Murphy). The PECS phases were included in R.'s IEP for 2001-2002, with the goal being that she would master up through Phase Three. Mrs. L. agreed with these objectives. See Hearing Transcript, Sept. 11, 2001, at 41-45.

R. began PECS training in the summer of 2001 under the instruction of Dr. Robert Murphy, a psychologist who had consulted on her PEDAL evaluation. On August 22, 2001, Dr. Murphy wrote to Maureen Schiffer to report on R.'s progress: she was still working on Phase One, and had just been introduced to Phase Two. See Administrative Record at Exh. P-29. While R. was doing well with PECS to that point, Dr. Murphy felt that additional teaching was needed so that R. would use PECS more frequently:

> The problem is, if that if you did an analysis of [R.]'s behavior in Phase One and you were just looking at correct versus incorrect, was she able to do it with that minimal prompt, you might get—you know, you know, you might get really nice results. You might get 80, 90 percent correct. The problem is, is that when you just stay in the percent correct world in terms of your analysis of her behavior, you're missing the fact that it may not be generalized. It may not be happening at a rate that is really appropriate.

Hearing Transcript, Sept. 14, 2001, at 61. Dr. Murphy stressed that R. was a child who might not ever be able to master the PECS system, though he felt she could complete the first three or four phases. To accomplish that within one year, he acknowledged, might cause a temporary loss in R.'s mainstreaming time: "I kind of felt for now she might do a little better with a little more of her program being in a dedicated site so that you have people with [a] higher level of training to work with her . . . ." Id. at 47.

The Plainville witnesses who testified at the administrative hearing also felt that R. would

require more time in one-on-one PECS instruction if she were to master her objectives for the

year.  Ann Sullivan, R.'s special education teacher for the 2001-2002 academic year, stated:

"[PECS] is being done and it's done in the mainstream this year . . . But in terms of taking her to

a new level, a lot of one to one instruction has to be done in order to move her from phase one, to

phase two, to phase three, and that's time-consuming."  Hearing Transcript, Sept. 19, 2001, at

170.  Ms. Sullivan felt that it would be "very difficult . . . to move [R.] along with the PECS

program if she spent more of her day in the mainstream."  Id. at 177.  Susan Steele, R's regular

education teacher, agreed with that assessment: "[R.]'s still at the early stages of her PECS

program and things like that.  So, and like I said before, she's easily distracted, so I think—I

think she's getting more out of the one on one than she would from me with 17 other children."

Hearing Transcript, Sept. 21, 2001, at 27.

Ann Sullivan stressed, however, that the ultimate purpose in immersing R. in one-on-one

PECS teaching was to better equip her for the mainstream education environment:

> I believe that [R.] spends an appropriate amount of time in the mainstream to meet
> the goals that she needs to work on.  Her maximum—how do I phrase this—when
> I developed her schedule I developed it with all of her goals and objectives in
> mind, and what functional skills she needed to work on.  And my attempt was to
> have her in the mainstream as much of her day as possible.

Hearing Transcript, Sept. 19, 2001, at 176-77.  Ms. Sullivan's testimony echoed Dr. Murphy's

stated goals in recommending the PECS system for R.:

> . . . we need to be clear on what [R.] can achieve that is functional, age
> appropriate and achievable and reasonable time lines, because there may not be a
> great deal that she can [do] that meets those guidelines.  So my feeling was we
> wanted her to have an effective communication system . . . because that would
> result not just in her being a calmer learner but really in her being a happier
> student.

17

Hearing Transcript, Sept. 14, 2001, at 36.

Upon its review, the Court affirms the decision of the hearing officer and finds that R.'s IEP provides her with mainstream education to the maximum extent possible. The 2001-2002 IEP (with the technical modifications ordered by the hearing officer) kept R. in mainstream or reverse mainstream environments for half of her educational time. Yet it is conceded that R.'s mainstream time was for social modeling and behavioral purposes. R.'s real academic progress depended on the success of her PECS instruction, something which (at least initially) required her to be taught in a more isolated and focused environment. Furthermore, the Court is mindful that the administrative witnesses agreed that, although the early phases of PECS instruction require R. to be pulled out of a mainstream classroom, her mastery of the system would only enhance her ability to profit from a mainstream environment.

Nor does the Court agree that the hearing officer failed to consider adequately how supplementary aids and services could increase R.'s mainstream time. There was substantial testimony about the audiological services R. needed to succeed in mainstream education, which Plainville agreed to supply and details of which the hearing officer ordered appended to the IEP. R.'s IEP included an elaborate assistive technology plan, which provided her with specially tailored computer activities in the mainstream classroom that loosely track the regular third-grade curriculum. See Administrative Record at Exh. B-8; Exh. B-1 at 37-44; Hearing Transcript, Sept. 21, 2001, at 45-136 (testimony of Lauri Susi).

The testimony also established, however, that R. enjoyed a wide range of pull-out supplementary services (in addition to PECS training). That pull-out time helped R. build and maintain the skills she needed to be successful in the mainstream: Mrs. L. herself testified that

18

the services R. receives outside of the mainstream classroom, including speech and language therapy, adaptive physical education, and physical therapy "are all very important" to her continued development.  Hearing Transcript, Sept. 11, 2001, at 102.   Increasing R.'s time in the mainstream classroom would mean cutting back other important parts of her program.  Finally, R.'s independent PEDAL evaluation concluded that R. was "getting enough support and opportunity given her ability level" and did not require greater mainstreaming.  Administrative Record, Exh. B-16 at 7.  Plainville continues to screen and monitor R. regarding her need for both mainstream time and supplementary services.  See Hearing Transcript, Sept. 24, 2001, at 52-56, 72-74 (testimony of Maureen Schiffer).

For the above reasons, the Court affirms the decision of the hearing officer and finds in favor of the defendant on these claims.

### C.     The Independent Educational Evaluation Obtained by Mr. and Mrs. L.

Mr. and Mrs. L. also contest the hearing officer's decision as it relates to an independent evaluation of R.'s educational program conducted by Dr. Judith Itzkowitz in fall 2000.  Contrary to the decision of the hearing officer, the Ls allege that Plainville both was required to fund this evaluation, and that upon refusing to pay for the evaluation, Plainville was required to submit the dispute for resolution at a due process hearing.

The Court finds Mr. and Mrs. L's arguments inapposite under both federal and Connecticut law.  Both the federal and state regulations clearly state that "a parent has the right to an independent educational evaluation at public expense *if the parent disagrees with an evaluation obtained by the public agency*."  34 C.F.R. § 300.502(b)(1) (emphasis added); see also Conn. Agencies Regs. § 10-76d-9(c)(2) ("Parents have the right to an independent

19

evaluation at public expense *if the parents disagree with an evaluation obtained by the board of education.*") (emphasis added).

It is undisputed that Mr. and Mrs. L. desired the evaluation by Dr. Itzkowitz as an additional source of information on R.'s program, not because they disagreed with any of the defendant's evaluations. Mrs. L. testified at the administrative hearing that she agreed with the assistive technology and PEDAL evaluations paid for by Plainville. Hearing Transcript, Aug. 28, 2001, at 128, 143, 152. It was while the PEDAL evaluation was in progress that Mrs. L. sought another evaluation by Dr. Itzkowitz:

> [T]he focus of the PEDAL evaluation was to evaluate [R.] and her abilities and her levels of ability at this time. And I didn't really see how it would evaluate the program that was in place and the concerns that I kept bringing . . . I hoped that [Dr. Itzkowitz] . . . would give me information, on, you know, what—what is appropriate and what are the options out there. I hadn't no [sic] understanding of this whole system when I placed [R.] in here.

Id. at 152-53. See also Administrative Record at B-85 (letter from Mrs. L. to Maureen Schiffer).

While Dr. Itzkowitz's efforts indeed may have been useful to the Ls, the law is clear that Plainville was not required to fund that evaluation; the Board was contemporaneously funding other evaluations which the Ls had requested, and there was no disagreement between the parties over any existing evaluation when Mrs. L. requested that Plainville also pay for Dr. Itzkowitz's work. Mrs. L. viewed Dr. Itzkowitz's work as supplementing, not supplanting or contradicting, the PEDAL evaluation: "I didn't feel PEDAL was the same as what I was asking for or gave me the information I felt was necessary to provide [R.]'s program . . . ." Hearing Transcript, Aug. 28, 2001, at 174. Nonetheless, the parties agree that the PEDAL evaluation was comprehensive and interdisciplinary in its review of R.'s abilities. The PEDAL evaluation also made

recommendations as to how to tailor R.'s educational program to her particular needs, and in what contexts mainstreaming R. would be appropriate. <u>See</u> Administrative Record at Exh. B-16. Against the backdrop of that study, the Court cannot agree that Plainville was required to retain Dr. Itzkowitz to conduct another evaluation. IDEA's requirement that disabled children receive a free adequate public education does not mean that school districts must supply "everything that might be thought desirable by loving parents." <u>Tucker v. Bay Shore Union Free Sch. Dist.</u>, 873 F.2d 563, 567 (2d Cir. 1989).

Likewise, Plainville was not required to take the Ls to due process over this issue. Again, the federal regulation requiring a school district or public agency to initiate a due process hearing regarding an outside evaluation is triggered by the requirement that a parent disagree with an evaluation obtained by the public agency. <u>See</u> 34 C.F.R. § 300.502(b); <u>accord</u> Conn. Agencies Regs. § 10-76d-9(c)(2). When there is no disagreement as to the agency's own evaluation, then there is no need for a due process hearing to determine whether that agency evaluation is appropriate. <u>Id</u>. As the hearing officer in this case recognized, Plainville was under no obligation to hold a due process hearing when it declined to conduct *additional* outside evaluations at public expense. <u>See</u> Administrative Decision at 10.

The Court affirms the decision of the hearing officer and finds in favor of the defendant as to these claims.

### D.    Early Dismissal from School

Mr. and Mrs. L. argue that R.'s early dismissal from school on Friday afternoons violated the IDEA and denied R. a free adequate public education, because non-disabled children were

not subject to similar early dismissals.[10]  They also argue that the early dismissal violated Conn.

Agencies Regs.  § 10-76d-3, which states that "the minimum school day and year for children

requiring special education and related services shall be the same as that for children in the

regular education program."

The Friday early release was designed to allow staff members in Plainville's

Developmental Program (the subsection of special education in which R. was enrolled) time to

meet and discuss the programs of individual students.  The early release was noted on R.'s June

2001 draft IEP,[11] and Maureen Schiffer wrote to Mrs. L. on July 31, 2001 that early release "was

vital to [R.]'s individual program, as it requires intensive planning.  This is not in violation of

IDEA as this has been part of the Developmental Program since its inception."  Administrative

Record at Exh. B-55.

At the administrative hearing, Mrs. L. testified that it was her understanding that all

special education students were released early on Fridays to allow time for Developmental

Program staff meetings, and that she had previously attended team meetings held on Friday

afternoons.  See Hearing Transcript, Aug. 28, 2001, at 96; Hearing Transcript, Sept. 11, 2001, at

55.

Maureen Schiffer, in her testimony, acknowledged that the Developmental Program

meetings served 12 different children, but that "due to the intensity of [R.]'s program, often times

---

[10] R. left school on Fridays at 1:25 p.m., two hours before the regular dismissal at 3:25
p.m.

[11] The June 2001 IEP stated that R's Friday early dismissal would be at 1:00 p.m.  By the
beginning of the academic year (and the time the administrative hearing was held), this had been
modified to 1:25 p.m.

even during this team meeting [not specifically devoted to R.'s PPT], which was really set aside for other children [as well], we did have to bring up issues regarding [R.] just because they were urgent and needed to be dealt with."  Hearing Transcript, Sept. 24, 2001, at 44.  Ms. Schiffer went on to state that while the Friday meetings concerned the Developmental Program as a whole, "[R.] benefits the most from that. . . .  we could not run [her] program without additional team time to the standard that we wanted to run it."  Id. at 92.

The Court finds that the Friday early dismissal, which was accounted for in R.'s IEP, did not deny her a fair adequate public education.  The goal of the Friday meetings was to coordinate and improve upon the delivery of services to R.  In including this time for team meetings in R.'s IEP, Plainville met the first prong of the Rowley test, by complying with the procedural requirements of IDEA.  The Court also finds that the Friday early dismissal met the second prong of the Rowley test, that measures must be "reasonably calculated to enable the child to receive educational benefits."  Board of Educ. v. Rowley, 458 U.S. at 206-07.   As over 12 individuals regularly work with R., it is reasonable to assume that a weekly meeting at which those staff members could share information would enhance the overall quality of her educational program.

Nor does the Court agree that R.'s early dismissal violated the Connecticut regulation.[12] Even with the early Friday dismissal, R.'s schedule provided for total educational time above the state minimum requirements.  See Administrative Record at B-55.  The Court construes Conn. Agencies Regs.  § 10-76d-3 to mean that all students, in both regular and special education, must receive at least 900 hours of instructional time per year and attend school for at least 180 days, as

---

[12] The Court notes in passing that Mrs. L. herself had requested R. be dismissed from school early for part of the 1999-2000 school year, in an attempt to reduce R.'s stress levels and sleep disorders.  See Hearing Transcript, Aug. 28, 2001, at 83-84.

required by Connecticut law.  See Conn. Gen. Stat. § 10-15.  As it is undisputed that R.'s program exceeded these baselines, her IEP was not in violation of state law.  Therefore, the Court affirms the decision of the hearing officer and finds in favor of the defendant on this claim.

### E.    Retention of an Independent Outside Consultant

Finally, Mr. and Mrs. L. argue that the hearing officer inappropriately denied their claim that a mutually-agreed upon outside consultant was necessary to provide R. a free adequate public education.  They argue that the hearing officer's decision that "any other issues not specifically mentioned are found in favor of the board" was too cursory and lacked sufficient analysis of why another consultant should not be retained.  See Administrative Decision at 11.

While the hearing officer's final order certainly could have explained her reasoning more fully, the Court finds that the hearing officer did analyze the request for an outside consultant in the sections of her opinion listing factual findings and conclusions of law.  The findings of fact summarized the qualifications and testimony of Dr. Felicia Morgan (the outside consultant currently retained by Plainville) and Dr. Judith Itzkowitz (Mr. and Mrs. L's preferred consultant).  See Administrative Decision at 5.  The hearing officer determined, in her conclusions of law, that "The Board's evaluations assessed the student in all areas of need and the Board had an education consultant already—Dr. Morgan.  Nor is there any requirement that the Board hire consultants selected by the Parents."  Id. at 10.

Moreover, the Court agrees with the hearing officer's conclusion regarding an outside consultant.  While an outside consultant is valuable in providing direction to R.'s overall program, Dr. Morgan appears to have filled that role adequately.  Again, the goal of IDEA is to provide a program "reasonably calculated" to ensure educational benefits; Plainville's retention of

Dr. Morgan's services appears to meet that standard.  Mrs. L. testified, "I like Dr. Morgan. We've had a good working relationship. . . . [S]he is a very skilled person."  Hearing Transcript, Sept. 11, 2001, at 86-87.  Despite her frustrations with Plainville, Mrs. L. also testified that her daughter's program in its current staff makeup had provided R. educational benefits: "[The staff] works very, very hard . . . they have huge hearts and they have done wonderful things for my daughter."  Id. at 102.

Nonetheless, Mrs. L. had two major concerns with using Dr. Morgan as R.'s outside consultant: she worried that Dr. Morgan was insufficiently available to consult with R., and that Dr. Morgan did not have sufficient experience with PECS, the communication system to be used exclusively with R. during the 2001-2002 school year.  See id.  In response to Mrs. L.'s first concern, Plainville agreed to increase Dr. Morgan's consulting time so that she would work exclusively with R. three hours per month.  See Hearing Transcript, Sept. 19, 2001, at 18.

As to the second concern, Dr. Morgan testified that she had been trained in PECS and had developed and implemented PECS systems for other students.  While Dr. Morgan testified that she had concerns about the ultimate success of a PECS communication system for a child as compromised as R., this did not limit her ability to answer questions about teaching PECS. Furthermore, the staff who were directly responsible for teaching PECS to R. had been trained by PECS specialists.  See id. at 40-44, 56.  The Court also notes that the administrative hearing took place at the beginning of the 2001-2002 school year, before the Ls had the opportunity fully to assess Dr. Morgan's abilities in overseeing an all-PECS system.

Moreover, the clear thrust of Plainville's testimony was that Dr. Morgan was an effective consultant, and that bringing in a different or an additional consultant might be deleterious to

R.'s program.  Maureen Schiffer testified that Dr. Morgan "was highly regarded by the staff.

She's really easy to work with.  Quite frankly, Dr. Itzkowitz has been involved previously [in

Plainville] . . . and it was not a good relationship with the school."  Hearing Transcript, Sept, 24,

2001, at 66.  Ms. Schiffer also mentioned that the question of additional consultants "has been a

huge concern of mine.  There have been a lot of folks involved with [R.]'s program, all with the

best of intentions.  But it's been my observation that the more folks we get involved, the more

confusing it gets."  Id. at 65.  Anne Walsh, a special education program specialist employed by

Plainville, was asked if R. needed an outside consultant; Walsh responded, "No.  I think Dr.

Morgan's consultation would be great."  Hearing Transcript, Sept. 21, 2001, at 170.  Ann

Sullivan, R.'s special education teacher for 2001-2002, testified that "Dr. Morgan makes

excellent recommendations" and that Dr. Morgan "helps some with the PECS, [because] she has

lots of experience with the picture exchange program . . . ."  Hearing Transcript, Sept. 19, 2001,

at 186-87.

Given this evidence, and given the limited nature of Mrs. L.'s concerns with Dr. Morgan,

the Court finds that it was reasonable for Plainville to retain Dr. Morgan as R.'s outside

consultant, and that the decision not to hire another outside consultant did not deprive R. of a fair

adequate public education.  The Court affirms the decision of the hearing officer and finds in

favor of the defendant as to this claim.

### F.    Attorney's Fees

The IDEA provides that "in any action or proceeding brought under this section, the

court, in its discretion, may award reasonable attorney's fees as part of the costs to the parents of

a child with a disability who is the prevailing party."  20 U.S.C. § 1415(i)(3)(B).  An

administrative due process hearing is a qualifying "proceeding" under the statute.  See L.C. v.
Waterbury Bd. of Educ., 2002 U.S. Dist. LEXIS 6079, *9 (D. Conn. Mar. 21, 2002).
Mr. and Mrs. L. claim that they should be considered a prevailing party and awarded attorney's
fees for the underlying proceeding because they received at least some of the relief they sought at
that hearing: namely, the hearing officer ordered that R.'s IEP be amended to reflect the proper
number of hours that she spent in each segment of her program, as well as to include the
additional services Plainville had agreed to provide, such as R.'s audiological plan and the
increased time for Dr. Morgan's services.

In Buckhannon v. West Virginia Dep't of Health, 532 U.S. 598 (2001), the Supreme
Court clarified the prevailing party standard in civil rights lawsuits.  The Court, considering a
claim for attorney's fees under the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 et
seq., and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., concluded that
a prevailing party is "one who has been awarded some relief by the court."  Id. at 603.  The
Second Circuit has held that Buckhannon applies to attorney's fees cases brought under the
IDEA.  See J.C. v. Regional School Dist. 10, 278 F.3d 119 (2d Cir. 2002).

To qualify as a prevailing party in an IDEA case, "a litigant must demonstrate that: (1) He
obtained relief on a significant claim in the litigation; (2) such relief effected a material alteration
in his legal relationship with the defendant; and (3) the alteration is not merely technical or de
minimis in nature."  Kathleen H. v Mass. Dep't. of Educ., 154 F.3d 8, 14 (1 st Cir. 1998) (citing
Texas State Teachers Ass'n v. Garland Indep. School Dist., 489 U.S. 782, 791-93 (1989); see
also Christopher P. v. Marcus, 915 F.2d 794, 804 (2d Cir. 1990); D.H. v. Ashford Bd. of Educ., 1
F. Supp. 2d 154, 159 (D. Conn. 1998).   While a plaintiff does not have to prevail on every issue

27

to be considered a prevailing party, there must be "a causal connection between the litigation and the relief from the defendant." G.M. v. New Britain Bd. of Educ., 173 F.3d 77, 81 (2d Cir. 1999) (quoting Wheeler v. Towanda Area Sch. Dist., 950 F.2d 128, 131 (3d Cir. 1991)).

The Court holds that the plaintiffs cannot be considered "prevailing parties" for the purposes of IDEA's fee provision, based on the results of the administrative hearing. At that hearing, the defendant prevailed on every substantive question submitted for decision. See Administrative Decision at 11. The only sections of the ruling which can be construed as awarding relief to the Ls are the hearing officer's instructions that the IEP be amended "to incorporate the specific amount of hours of special education services and mainstream services currently provided her and to incorporate audiological services, including hearing aids and FM system." Id. The amendments to R.'s hourly schedule were technical, not substantive; Plainville was directed to recalculate the time that R. *already* was spending in the different areas of her program and to ensure that the IEP reflected the correct hourly breakdown. Technical, de minimis alterations do not qualify as substantial relief for the purposes of awarding attorney's fees. See Kathleen H., 154 F.3d at 14.

Similarly, the direction to amend R.'s IEP to incorporate an audiological plan did not constitute new relief awarded by the hearing officer. Plainville's intention to provide audiological services previously was referenced in R.'s draft IEP, with the notation that a full plan would be developed over the summer of 2001. See Administrative Record, Exh. B-1 at 9. The administrative record also shows that Plainville made efforts to develop this audiological plan before the 2001-2002 academic year began, but was delayed by the unavailability of R.'s private audiologist and the Board's own consulting audiologist. See id. at Exh. B-55, B-57.

Given the record, there is no reason to believe that Plainville would not have instituted an audiological plan but for the decision of the hearing officer.  The intent to create an audiological plan was already present in the draft IEP, and Plainville reiterated its willingness to provide such services during the pendency of the administrative hearing.  "Any legal obligation to develop and implement an IEP arises from the IDEA's statutory mandate and is not part of a judicial remedy. Moreover, even if the IEP changed the legal relationship between the parties, this change was not judicially sanctioned, as required by Buckhannon."  J.C. v. Regional School Dist., 278 F.3d at 125.

Therefore, the Court finds that the plaintiffs have not met the requirements of 20 U.S.C. § 1415(i)(3)(B) and declines to award them attorney's fees under that statute.

## V.     Conclusion

The evidence in this case supports the administrative hearing officer's decision in favor of the defendant school board, as the defendant has complied with the requirements of the IDEA and has developed a program reasonably calculated to provide educational benefits to the plaintiff.  Accordingly, the Court hereby GRANTS Defendant's Motion for Summary Judgment [Doc. #18] and DENIES Plaintiff's Motion for Summary Judgment [Doc. #15].  The Clerk is directed to enter judgment in favor of the defendant and close this case.

So ordered this __28th__ day of March 2005 at Hartford, Connecticut.


        /s/ CFD
        **CHRISTOPHER F. DRONEY**
        **UNITED STATES DISTRICT JUDGE**

29